## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Elizabeth Rask,

                 Plaintiff,

                                        **MEMORANDUM OPINION**

   v.                              **AND ORDER**
                                          Civil No. 05-1267 ADM/RLE

Fresenius Medical Care North America,

                 Defendant.

_____

Daniel E. Warner, Esq.,Warner Law Office, P.A., Inver Grove Heights, MN, on behalf of Plaintiff.

Marko J. Mrkonich, Esq. and Sandro M. Garofalo, Esq., Littler Mendelson, P.C., Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

On August 30, 2006, oral argument before the undersigned United States District Judge was heard on Defendant Fresenius Medical Care North America's ("Defendant" or "Fresenius") Motion for Summary Judgment [Docket No. 35]. In her Complaint, [Docket No. 1], Plaintiff Elizabeth Rask ("Plaintiff" or "Rask") asserts claims of discrimination and failure to make reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08. Plaintiff further alleges interference with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(1). Plaintiff has also filed an Application for Judgment by Default [Docket No. 49], alleging that Fresenius has failed to answer Plaintiff's Complaint. For the reasons set forth below, Plaintiff's Application for Judgment by Default is denied, and Defendant's Motion for Summary Judgment is granted.

## II. BACKGROUND

### A.    Rask's Employment History

Plaintiff was hired as a patient care technician ("PCT") in the dialysis unit at Miller-Dwan Medical Center in Eveleth, Minnesota in April 1998.[1]  Garofalo Aff. [Docket. No. 38] Exs. B-1, B-2, B-3 (Rask Dep.) at 13-17; Warner Aff. [Docket No. 44] Ex. C-I at C4-C8.  Prior to commencing employment at Miller-Dwan, Rask completed a pre-placement medical evaluation on April 8, 1998.  Warner Aff. Ex. C-I at C4-C8.  On the medical evaluation form, Rask noted that she suffered from depression and took Prozac to treat her condition.[2]  Id. at C4-C5.  Rask continued to receive treatment and take medication for her depression while employed at Miller-Dwan, and later Fresenius.  Rask Dep. at 51; Warner Aff. Exs. C-I to C-II.

Rask was subsequently laid off from the Eveleth clinic because the number of patients declined; however, she occasionally worked on-call in the Miller-Dwan Duluth clinic on a "per diem" basis.  Rask Dep. at 19, 30-32.  In September of 2000, Fresenius acquired the Miller-Dwan dialysis units.  Id. at 30, 32, 34.  Plaintiff continued working in Duluth as a per diem employee until she became a regular permanent employee at the clinic on April 15, 2001.  Id. at 36, 41-42, 44, 93, Ex. 3.

According to Plaintiff, on her first day of work in Eveleth in 1998, a nurse gave her an instruction in a rude manner.  Id. at 24-25.  Rask also stated that some of her co-workers were

---

[1] In her deposition testimony, Rask stated that she began employment at Miller-Dwan in April 1997.  Based on later testimony and the dated pre-employment medical examination, the actual date of her application and employment is more likely April 1998.

[2] Defendant avers that Miller-Dwan never transferred this form to Fresenius, and that Fresenius saw this form for the first time during this litigation.  Mitchell Supplemental Aff. [Docket No. 55].

part of a clique from which she was excluded.  Id. at 27.  Rask, however, denied that this

treatment was based on any discriminatory animus.  Id. at 26.  Rask stated that after she became

a regular employee, there were "always incidences" in which she felt that she was treated

unfairly, including one occasion when a co-worker told Plaintiff that she smiled too much.  Id. at

53-54.  Plaintiff alleges that she was unfairly assigned to work with difficult patient groups, and

she experienced "petty" unfair and inappropriate treatment.  Id. at 57, 61.  Although Rask

complained about the treatment, nothing was done to address it.  Id. at 57.  Rask claims that the

unfair treatment continued after Patricia Pederson ("Pederson"), Clinical Manager of the Duluth

unit, became her supervisor in March of 2003.  Id. at 64; Garofalo Aff. Ex. D-1 (Pederson Dep.)

at 7, 11.  This treatment included not having meetings and being given short notice regarding the

work schedule, conditions that Plaintiff felt were "terrible" and "very stressful."  Rask Dep. at

64.  She also regarded as unfair and inappropriate the fact that the employees "worked short"

without adequate coverage for shifts, were instructed to use limited amounts of supplies such as

bandages and gauze, and were expected to learn to use new machines quickly.  Id. at 73-74.

However, Rask also acknowledged that these working conditions affected all employees in the

unit and were not specifically directed at Rask.  Id. at 64, 73, 75.

According to Plaintiff, after she was hired as a permanent employee in Duluth in 2001,

she had fairly regular attendance.  Id. at 81.  She denied that there were any major life activities

in which she was unable to participate, stating "I was pretty much hanging in there" and "trying

hard."  Id. at 82.  Plaintiff stated that at that time, her medication was "pretty much working."

Id. at 83.  She felt all the employees were "stressed" during that time and "were trying to get

through with the major corporation taking over" because of the differences in operations

between Fresenius and Miller-Dwan.  Id. at 82.  She alleges the "stress" at work and the "fact

that [Fresenius] didn't care how [the employees] felt" and "it was all about the money . . . [and]

how much Fresenius could make" caused her to be disabled.  Id. at 80.

## B.    Defendant's Policies

Defendant's corrective action policy is outlined in the Field Services Human Resource

Policy Manual and consists of progressive and cumulative disciplinary steps.[3]  Garofalo Aff. Ex.

C (Mitchell Dep.) Ex. 53.  The FMLA policy is outlined both in the Policy Manual and the

Employee Handbook.  Garofalo Aff. Ex. D-2 at 25-31, 45-46.  Although Rask testified that she

cannot recall receiving or reading these policies, she signed an acknowledgment of receipt for

the Employee Handbook and admits access to the Policy Manual.  Rask Dep. at 92, 171-73, Ex.

5.  Further, according to Christine Mitchell ("Mitchell"), Area Manager, all employees attend

orientation and training sessions at which both policies are reviewed.  Mitchell Dep. at 81.

## C.    Rask's Disciplinary History

Although Rask's early evaluations reflect that she performed her job well, in late 2002,

she began to have performance issues.  Warner Aff. Ex. D.  On December 21, 2002, Kim Class,

R.N., ("Class"), and Amanda Caine, R.N., ("Caine") wrote statements documenting an incident

involving Rask and another employee that took place on that day.  Rask Dep. at 111-18, Exs. 17-

18.  According to the written accounts, Rask became angry with a co-worker, and she and the co-

worker "got into a yelling match on the floor" and were both "out of control."  Id. Ex. 17 at

---

[3] The Field Services Human Resource Policy Manual states: "The corrective action
process generally consists of: verbal warning(s), written warning, including final written,
suspension and/or termination. . . . Corrective action is an ongoing process regardless of the
reason for prior infractions.  The process does not start over each time a different problem
arises."  Mitchell Dep. Ex. 53 (emphasis in original).

BMA/Rask 0280.  Plaintiff also failed to assist in patient care and complained loudly within the hearing range of patients.  Id. Exs. 17-18.  Rask disputed the accuracy of the statements and did not recall this incident "being that terrible."  Id. at 112-13, 116.

The next day, on December 22, 2002, Caine submitted a second statement reporting that Rask was acting inappropriately toward a co-worker and made a comment about "just sticking in another needle" in a "mean" tone within earshot of a patient.  Id. at 118-21, Ex. 19.  Reportedly, Plaintiff was also unresponsive to urgent patient care situations that occurred during her shift. Id. at 119-20, Ex. 19.  Rask denied that these events occurred.  Id. at 118-19.  Class documented a third incident involving Rask on May 2, 2003.  Id. at 122-24, Ex. 21.  According to Class, Rask was acting upset and was disrespectful toward Class.  Id. at 123, Ex. 21.  Rask denied the accuracy of the statement, stating that "half of it isn't true."  Id. at 124.

On September 25, 2003, Rask reportedly became "very angry" and "verbally abusive to staff" upon learning that a co-worker had permission to change her schedule.  Id. Ex. 23 at BMA/Rask 047.  In addition, she was loud, complained to patients, and ignored patient needs. Id.  On September 27, 2003, staff members complained that it was "very difficult to work with" Rask, and that Plaintiff's anger caused a staff member to be afraid.  Id.  On October 1, 2003, Pederson met with Plaintiff and administered a written warning to her regarding her behavior on September 25 and 27.  Id. at 128-29, Ex. 23.  Specifically, the warning states that Rask ignored patient needs, refused to help staff when necessary, exploded over small things, used foul language, and was mean.  Id. Ex. 23 at BMA/Rask 047.  Pederson advised Rask to treat all patients and staff in a respectful manner, refrain from using inappropriate language, express her anger in an appropriate manner and not in the presence of patients, and respond immediately to

5

patient needs.  Id.  Rask declined to sign the corrective action form and requested a mediated session to discuss the issues in the written warning.  Id. Ex. 23 at BMA/Rask 048.

Plaintiff did not mention her mental health issues during the requested mediation session, which was attended by Rask, Pederson, Mitchell, and the co-worker with whom Plaintiff was angry.  Id. at 131.  Rask stated that during this meeting she "did not say [she had] mental health problems," and "never explained it that way," rather, only stated that she was "on medication." Id. at 132.  Rask acknowledged that as of October 1, 2003, she had not personally told the co-worker, Pederson, or Mitchell that she had mental health issues that required medication.  Id. at 133.  Rask, however, claimed that they were aware of her condition through "hearsay."  Id. at 132.

On October 24, 2003, Rask received a final written warning as a result of her unscheduled absences.  Id. at 133-34; Pederson Dep. at 72.  Plaintiff acknowledged that she understood that it was important for her to improve her attendance, as absences put a burden on her co-workers.  Rask Dep. at 135.  According to Pederson, during this warning she discussed Rask's absenteeism with her and "asked if there was anything that we could do for her, was there anything wrong."  Pederson Dep. at 73.  Rask did not offer any explanation as to why she was absent, other than that she was sick.  Id.  Pederson did not ask Rask for a doctor's note at this time and stated that she had never asked for doctors' notes from any employees in the past.  Id. at 73-74.

On March 1, 2004, Rask was upset about being scheduled to work in Eveleth and called Pederson at home to discuss it with her.  Rask Dep. at 137, 140.  Plaintiff placed the call from an open area at work, and the conversation was overheard by three staff members and four patients.

Id. at 140, Ex. 26.  Staff reported feeling "very uncomfortable" with Rask's anger and felt intimidated and embarrassed that the incident occurred at work and in the presence of patients. Id. Ex. 26.  Rask acknowledged that the Duluth unit was overstaffed, and "everybody was supposed to go" to Eveleth to fill in on occasion.  Id. at 137.  According to Rask, she explained to Pederson that she did not want to work in Eveleth because on her first day there, six years earlier, a nurse was rude to her, and Plaintiff "doubted" whether things had changed since that time.  Id. at 148.  During the conversation, Rask was loud, crying, and disrespectful toward Pederson and ignored requests to discuss the matter at work the following day.  Id. Ex. 26.  Rask told Pederson that she felt that she did not receive any respect "especially from her," and told Pederson that "she ha[d] no heart."  Id. at 137-38, 146.

As a result of the March 1 incident, Rask was suspended on March 5, 2004.  Id. at Ex. 26. At that time, Rask was advised that she must abide by the expectations for employee conduct set forth in the Human Resource Policy Manual, and that ongoing negative remarks about her supervisor, the company, her unit and her co-workers would not be tolerated.  Id. Ex. 26 at BMA/Rask 054.  She was also notified that failure to meet expectations for change would result in further corrective action, and possibly termination.  Id.  Rask did not discuss her medication or mental health during her telephone conversation with Pederson on March 1, 2004, or during the explanation of the corrective action and suspension on March 5, 2004.  Id. at 148-49.

According to Rask, on March 22, 2004, she began taking a new medication and had been at work for an hour when she started feeling anxious, could not think clearly, and was "not really [her]self."  Id. at 153.  Rask claimed that her "mind was boggled," she "couldn't concentrate," had racing thoughts, and felt that she "couldn't do this [work] today."  Id. at 65-66.  Rask stated

that she told Pederson that she was "not feeling right" and was "having side effects" from her medication.  Id. at 66, 153.  Pederson asked Rask if she would like to lie down, but Plaintiff stated that she wanted to go home, and subsequently left work.  Id.  Plaintiff understood that her early departure constituted a violation of the attendance policy.  Id. at 155.

After this incident, Mitchell and Pederson met with Plaintiff to discuss her absence.  Id. at 66; Mitchell Dep. at 72-74.  According to Rask, she explained why she left and Mitchell said, "this is the first time I've heard about any depression or anything."  Rask Dep. at 66.  Plaintiff also claimed that she told Pederson and Mitchell that she was "having problems with [her] medication."  Id.  Mitchell denied knowledge that Rask was suffering from depression, and claimed that Plaintiff stated only that "I'm sure that you've heard that I'm on medication and everybody on the floor is talking about it."  Mitchell Dep. at 71.  Mitchell has testified she had not "heard" that Rask was on medication, and Plaintiff did not elaborate further on her remark. Id. at 71-72, 74.  Mitchell claimed that during this meeting she asked Rask "[i]s there anything else that would be important for us to know . . . about this?"  Id. at 72.  Plaintiff allegedly responded that she did not like working for Defendant, it was a "terrible" place to work, she felt underappreciated, and people did not like her.  Id.  Plaintiff claimed that in addition to Pederson and Mitchell, "everybody in Eveleth knew [she] took Prozac" and "whenever anything happened at that unit, no matter if it was supposed to be private or not, everybody knew about it."  Rask Dep. at 80.  Plaintiff claimed that she told a co-worker, Paula, about her depression and asserted that another co-worker, Jessica, knew "probably because [Rask] was crying all the time at work."  Id. at 81.

On May 10, 2004, Rask was absent from work because she was seeing her doctor about

8

medication for her depression.  Id. at 155.  On May 28, 2004, Rask was scheduled to work at the

Eveleth clinic.  Id. at 156-57, Ex. 30.  Rask stated that she was not happy about being scheduled

to work in Eveleth, and she did not want to work there because of the way that she had been

treated previously.  Id. at 69-70.  According to Plaintiff, on May 27, 2004, she was instructed by

her doctor that she needed to have her medication adjusted and should not go in to work.  Id. at

66-67, 70, 156, 158.  Rask stated that she called Pederson and told her that she would not be able

to work the following day (May 28) because she "need[ed] help with [her] medication" and she

was "having a lot of side effects from what they put [her] on."  Id. at 156, 158.[4]  During this time

period, Plaintiff was working only two days per week.  She could not recall why she did not go

to the doctor on a day that she was not scheduled to work.[5]  Id. at 160-61.

Pederson stated that she did not try to find out why Rask was absent on May 28, because

she and Rask "had talked about her absences" previously during corrective action meetings, and

Plaintiff "didn't give [Pederson] any reasons for her many absences."  Pederson Dep. at 72.

Plaintiff did not specifically mention that her medication was for depression in this conversation,

however she claims Pederson "knew it was for [her] depression."  Rask Dep. at 158.  Although

Plaintiff did not provide specific instances of conversations, she asserted that she discussed her

---

[4] Pederson has testified that Rask did not call her, but called someone in Eveleth directly and told that person that she would be absent from work.  Pederson Dep. at 67.  Pederson claimed that she did not learn about the absence until a co-worker told her about it.  Id. at 68.

[5] Rask's hours were adjusted at least four times at her request during her employment.  Rask Dep. at 97-98, 102, 108, 136, 151.  Rask testified that in general, an employee could reduce his or her schedule at any time and "it was up to the person what they wanted to work."  Id. at 98.  Rask did not indicate that any request for a reduction in hours was related to her mental or physical health.  Id. at 97, 99.  Apparently, the only time that Rask's request for a change in hours was not accommodated was during a period when all available personnel were needed to assist in the operation of a new unit.  Id. at 72, 124-25.

depression with Pederson "at times, on the phone, in person." Id. at 159.  Pederson denied that

Rask ever discussed with her having anxiety or depression.  Pederson Dep. at 88-89.  According

to Pederson, on one occasion a few months prior to Rask's termination, Rask told her "over the

telephone that she was going to see her doctor to get her medicine regulated," however Plaintiff

did not state what her medication was for.  Id. at 87-88.

Further, Rask did not submit doctor's notes for any of her absences resulting in corrective

action.  Rask Dep. at 155.  She never provided documentation of her depression or treatment to

Pederson or anyone else at Fresenius until after her employment was terminated.  Id. at 79, 159.

In addition, Rask never discussed or requested FMLA leave, according to Plaintiff, because her

"doctor preferred that [she] tried to stay working."  Id. at 79, 155, 176.

Pederson testified that, "the ongoing repeated absences, along with . . . the corrective

action process" led to Rask's termination.  Pederson Dep. at 81.  She further stated that the

termination was not based on one incident, rather, it was "a culmination of counseling sessions

and corrective action sessions that we had had with [Rask]."  Id.  According to Mitchell, the

absences constituted an additional policy violation, in a progressive and cumulative discipline

program.  Mitchell Dep. at 57.  Rask had not offered Mitchell any explanation for her absences

or early departure, and therefore Mitchell and Pederson decided to discharge Rask.  Id. at 60.

Rask was terminated on June 2, 2004.  Id. at 89; Rask Dep. at 152.  The termination

notice states that Rask violated Defendant's Attendance and Tardiness Policy, specifically that

she left ill one hour into her shift on March 22, and was absent on May 10 and May 28, 2004.

Rask Dep. Ex. 29.  The document further states that the "[e]xpected changes from previous

counseling and written Corrective Action Statements have not been fulfilled by [Rask]."  Id. at

164-65, Ex. 29.

On or about June 14, 2004, Mitchell received a fax from Eric Lehto, the Organizing

Director of the AFSCME union, transmitting a copy of a letter from Range Mental Health

Center.  Mitchell Dep. at 88, Ex. 51.  The letter was drafted by Katherine Cohen, D.O.,

Plaintiff's psychiatrist, on June 4, 2004, two days after Rask's termination.  Id.  In the letter, Dr.

Cohen stated that Rask was being treated at the clinic for major depression.  Id.  Mitchell

asserted that none of the information discussed in the letter was disclosed to Defendant during

Plaintiff's employment.  Mitchell Dep. at 90.

After her termination, Rask was unemployed until August of 2005.  Rask Dep. at 8-9, 89.

Rask alleges that during this time she could not function and was not well enough to look for

work consistently.  Id. at 89.  On or about March 11, 2005, Rask filed a charge of discrimination

with the United States Equal Employment Opportunity Commission ("EEOC").  Id. at 76.  In her

charge, she indicated that she was discriminated against based on her disability, and reported that

the discrimination took place between March 22, 2004, and June 2, 2004.  Id. at 77-78.  She

subsequently received a right to sue notice from the EEOC and the Minnesota Department of

Human Rights.  Compl. at 3.

## III. DISCUSSION

### A.    Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Defendant's Standing and Plaintiff's Application for Default Judgment**

In her Complaint, Plaintiff named Fresenius Medical Care North America as the Defendant.  In its Answer, Defendant identifies itself as "Defendant Bio-Medical Applications of Minnesota, Inc., d/b/a FMC Dialysis Services Duluth (erroneously identified herein as 'Fresenius Medical Care North America')."  Def.'s Answer at 1 [Docket No. 2].[6]  Plaintiff avers that because Bio-Medical Applications of Minnesota, Inc. ("BMA") is not a party to the lawsuit, it cannot properly bring the summary judgment Motion presently before the Court.  Further, Plaintiff argues that because BMA, not Fresenius, responded to the Complaint and has assumed the defense of the action, Fresenius has failed to timely answer the Summons and Complaint, and a judgment by default should be entered against Fresenius.

"Default judgment for failure to defend is appropriate when the party's conduct includes 'willful violations of court rules, contumacious conduct, or intentional delays.'"  Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 856 (8th Cir. 1996) (citing United States v. Harre,

---

[6] In this Order, Defendant will be referred to as "Fresenius," and not "BMA" to ensure consistency throughout the record.

983 F.2d 128, 130 (8th Cir. 1993)).  "The Federal Rules of Civil Procedure commit the entry of a

default judgment against a party to the sound discretion of the trial court."  <u>FTC v. Packers</u>

<u>Brand Meats, Inc.</u>, 562 F.2d 9, 10 (8th Cir. 1977) (citations omitted).  There is a "strong judicial

policy against default judgments" and a "judicial preference for adjudication on the merits."

<u>Oberstar v. FDIC</u>, 987 F.2d 494, 504 (8th Cir. 1993).

Both parties have submitted conflicting documents purporting to establish that Plaintiff's

employer was either Fresenius or BMA.  Plaintiff asserts that BMA is a separate legal entity

from Fresenius because BMA is a Delaware corporation, while Fresenius is headquartered in

Massachusetts, and is a wholly-owned subsidiary of Fresenius Medical Care AG & Co. KgaA,

located in Germany.  Warner Aff. Ex. A at 1-2.  Plaintiff's retention bonus agreement names

Fresenius as the employer, and Fresenius's Employee Handbook extends a welcome to new

employees of Fresenius.  Warner Aff. Ex. A at 4; Warner Supplemental Aff. [Docket No. 60] Ex.

O.  Defendant avers that BMA is actually Rask's employer and provides W-2 earning statements

naming BMA as Plaintiff's employer.  Mitchell Supplemental Aff. Ex. A.

Plaintiff argues that the proper employer must be determined because of the difference in

size between the entities.  If the Defendant has more than 500 employees, the amount of

compensatory damages is enhanced under 42 U.S.C. § 1981a(b)(3), based upon the number of

employees of the respondent.  BMA employs approximately 293 employees, while Fresenius is

in another category with over 500 employees.  Warner Supplemental Aff. Exs. N, L.

Which employer category Defendant fits in for the purpose of damage calculation under

42 U.S.C. § 1981a(b)(3) is an issue without consequence here.  Plaintiff has not established a

case of liability to proceed beyond summary judgment, and the issue of the number of employees of Defendant for damage calculation is not reached.

Further, Fresenius has not "failed to plead or otherwise defend" against Plaintiff's Complaint. Likewise, there has been no showing that Fresenius's conduct has been contumacious or that it has willfully violated court rules. BMA submitted a timely Answer to Plaintiff's Complaint, and admitted in the Answer that it was the proper defendant in this litigation, not Fresenius. In addition, this case has been actively litigated by both parties since the filing of the Complaint on June 28, 2005. As such, a default judgment against Defendant is not appropriate, and Plaintiff's Application for Judgment by Default is denied.

## C.      Incomplete Discovery

Plaintiff also objects to Defendant's Motion for Summary Judgment on the grounds that at the time of the hearing on the motion, discovery ordered by Chief Magistrate Judge Raymond L. Erickson [Docket No. 42] remained outstanding. Pl.'s Mem. Opp'n [Docket No. 43] at 6. Since the hearing, Plaintiff filed a supplemental memorandum in opposition to Defendant's Motion for Summary Judgment [Docket No. 59] based upon the additional discovery received by Plaintiff on August 30, and September 1, 2006. Plaintiff contends that still further discovery is necessary to demonstrate the existence of a genuine issue of material fact before the Court rules on the instant motion.

As the Eighth Circuit has noted, "[a]lthough a district court is required to give the parties ample time to conduct discovery, Rule 56(c) does not require the completion of all discovery before a court may enter summary judgment." Roark v. City of Hazen, 189 F.3d 758, 762 (8th Cir. 1999) (citing Dulany v. Carnahan, 132 F.3d 1234, 1238 (8th Cir. 1997)). "Rule 56(f) allows

a party to request a delay in granting summary judgment if the party can make a good faith showing that postponement of the ruling would enable it to discover additional evidence which might rebut the movant's showing of the absence of a genuine issue of material fact." Robinson v. Terex Corp., 439 F.3d 465, 467 (8th Cir. 2006) (citing Fed R. Civ. P. 56(f); Small Bus. Admin. v. Light, 766 F.2d 394, 397-98 (8th Cir. 1985)).

Plaintiff's Supplemental Memorandum argues that additional discovery is needed concerning primarily the issues of the status of BMA and Fresenius as the appropriate corporate defendant.  Plaintiff requests information about the corporate structure and size of BMA and Fresenius primarily for the purpose of determining limitations on damages under 42 U.S.C. § 1981a(b)(3).  Again, this issue is relevant only if Plaintiff could establish a *prima facie* case of liability which has not been accomplished.

The Plaintiff also avers that the names and contact information of Plaintiff's former co-workers are necessary to obtain evidence regarding the co-workers' observations of Plaintiff in the workplace and their knowledge of Defendant's awareness of Plaintiff's disability.  According to Plaintiff's own testimony, she only told one co-worker, Paula, specifically that she suffered from depression.  Rask Dep. at 81.  Plaintiff's further statement that one other co-worker, Jessica, "probably" knew about her depression because Rask was crying at work is not sufficient to establish that Plaintiff's former co-workers are likely to have knowledge of her depression. Id.  Further, there has been no showing that the management at Fresenius had any knowledge of Rask's depression.  Although Plaintiff insists that she told Pederson about her condition, Plaintiff could not recall specific conversations regarding depression, and only remembers vague, general statements to both Pederson and Mitchell about her medication and "not feeling right."  Id. at

15

153.  The discovery of the principal participants is complete and the testimony of tangentially involved co-workers is unlikely to create a genuine issue of fact.

Further, the time period for discovery as established in the Pretrial Order [Docket No. 9] terminated on June 1, 2006.  Plaintiff has not made a showing that discovery has been inadequate or that there is good cause to allow discovery beyond the time period allowed.

**D.    ADA**

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability."  42 U.S.C. § 12112(a).[7]  A "qualified individual with a disability" is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position."  42 U.S.C. § 12111(8).  To establish a *prima facie* case of discrimination under the ADA, Plaintiff must show that: (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) she suffered an adverse employment action under circumstances that give rise to an inference of unlawful discrimination based on disability.  Dropinski v. Douglas County, 298 F.3d 704, 706 (8th Cir. 2002).

**1.    Disability**

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[8]  42 U.S.C. §§ 12102(2)(A)-

---

[7] The MHRA parallels the ADA.  Therefore, the state and federal claims are analyzed together.  Longen v. Waterous Co., 347 F.3d 685, 688 n.2 (8th Cir. 2003).

[8] In her Memorandum in Opposition to Defendant's Motion for Summary Judgment, Plaintiff offers arguments only with respect to the first theory of disability, for this reason, the remaining two theories of disability are not addressed here.

(C).  The determination of whether a person has a disability under the ADA is an individualized

inquiry and is made with consideration to the mitigating measures employed by that person, such

as the use of medication.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999).  Major

life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  Several factors may be

considered to determine "whether a person is substantially limited in a major life activity: (1) the

nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-

term impact."  Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 679 (8th Cir. 2001) (citing 29

C.F.R. §§ 1630.2(j)(2)(i)-(iii)).  A major life activity is substantially limited if an individual is

unable to "perform a basic function that the average person in the general population can

perform" or is significantly restricted in "the condition, manner, or duration under which [she]

can perform a particular major life activity as compared to an average person in the general

population."  Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1206 (8th Cir. 1997); see 29 C.F.R.

§ 1630.2(j)(1).

        Plaintiff must present evidence from which a reasonable inference can be drawn that a

major life activity is substantially limited.  Snow, 128 F.3d at 1207.  "'[S]ubstantially' in the

phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'"  Toyota Motor Mfg.,

Ky., Inc. v. Williams, 534 U.S. 184, 196 (2002).  The ADA's terms are "interpreted strictly to

create a demanding standard for qualifying as disabled . . . ."  Id. at 197.  Plaintiff must present

evidence that she is prevented or severely restricted "from doing activities that are of central

importance to most people's daily lives."  Id. at 198.  Further, to be substantially limiting, the

"impairment's impact must also be permanent or long-term."  Id.

Plaintiff alleges that she is substantially limited in the major life activities of thinking, concentrating, sleeping, and working.  Pl. Mem. Opp'n at 29.  "The 'ability to perform cognitive functions on the level of an average person' constitutes a major life activity."  Battle v. United Parcel Serv., Inc., 438 F.3d 856, 861 (8th Cir. 2006) (citing Brown v. Lester E. Cox Med. Ctrs., 286 F.3d 1040, 1045 (8th Cir. 2002); Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999)).  "Accordingly, thinking and concentrating qualify as 'major life activities' under the ADA."  Id. (citations omitted).  However, an individual's "conclusory statements" that she has difficulty concentrating, coupled with an individual's own testimony that she could perform her job, does not suffice to establish that her condition significantly restricted her ability to concentrate as compared to the general population.  Heisler v. Metro. Council, 339 F.3d 622, 629 (8th Cir. 2003).

Plaintiff has failed to produce evidence to show that she is substantially limited in her ability to think and concentrate.  Despite her conclusory statements that she is so limited, the record does not support her contentions.  In her deposition testimony, she denied that there were any major life activities in which she was substantially limited during her employment with Defendant.  Rask Dep. at 81-83.  Further, she has testified that she did not read the corrective action policy as it was not necessary because she performed her job well.  Id. at 174.  A single incident, on March 22, 2004, when Plaintiff was unable to concentrate or think clearly at work does not give rise to an inference that she was substantially limited in a major life activity.  Id. at 65-66, 152-53.

Affidavits submitted by Rask's friends and family do not change the analysis.  Rask's husband stated that he observed her significant problems with thinking clearly and concentrating.  Robert Rask Aff. [Docket No. 46] at 1.  Monica Jeanette, Plaintiff's son's fianceé, attested that

18

Rask was having trouble focusing on anything but her depression in the last months of her employment with Defendant.  Jeanette Aff. [Docket No. 48] at 1-2.  Eric Lehto stated that during his conversations with Rask before her employment was terminated, she "had difficulty focusing on what [he] was saying" and had a hard time grasping what he was telling her.  Lehto Aff. [Docket No. 47] at 1-2.  Both Jeanette and Lehto testified that their observations of her difficulty concentrating occurred within a limited period, specifically the few months prior to her termination.  This limited duration does not suffice to show that Plaintiff's condition had a significant, long-term impact on her cognitive function.  In addition, the affidavits are not sufficient to controvert Plaintiff's own testimony that she was "hanging in there" and her activities were not limited by her depression.  Rask Dep. at 82.

Plaintiff's medical records also do not demonstrate that her abilities to think and concentrate are substantially limited on a permanent or long-term basis.  The records from December of 1997 through April of 2003 do not mention her difficulty with thinking or concentration.  Warner Aff. Exs. C-I at C1-C8, C10; C-II at 1-2.  On March 9, 2004, her medical record notes that Plaintiff's insight was slightly impaired, however her memory and orientation were normal.  Warner Aff. Ex. C-II at 3.  On April 23, 2004, her record reflects that she had problems with memory, concentration, and racing thoughts, however she was fully oriented and showed no indication of disturbance of thought processes.  Id. at 4-5.  According to her records, on May 5, 2004, Plaintiff was "thinking in circles," and on May 14, 2004, she was unable to think clearly.  Id. at 9-10.  Her records from November 11, 2004, January 28, 2005, and January 25, 2006 all indicate that there is "no depression" and make no mention of her ability to think or concentrate.  Rask Dep. Exs. 34-36.  The totality of her medical records demonstrates that

Plaintiff's ability to think and concentrate on a long-term basis as compared to the general population is not significantly limited.

  "'Sleeping' is also recognized by some courts as a 'major life activity.'" <u>Nuzum v. Ozark Auto. Distribs., Inc.</u>, 432 F.3d 839, 846 (8th Cir. 2005) (citing <u>Colwell v. Suffolk County Police Dep't</u>, 158 F.3d 635, 643 (2d Cir. 1998) (sleep is "undoubtedly a major life activity"); <u>Swanson v. Univ. of Cincinnati</u>, 268 F.3d 307, 315 (6th Cir. 2001); <u>Pack v. Kmart Corp.</u>, 166 F.3d 1300, 1305 (10th Cir.1999); <u>see also</u> <u>Heisler</u>, 339 F.3d at 628 (8th Cir. 2003) (assuming sleep is major life activity)).  Assuming that sleeping is a major life activity, to demonstrate a substantial limitation, an individual "must show that his sleeping patterns are significantly different from the rest of the population's." <u>Nuzum</u> 432 F.3d at 848 (holding that the plaintiff, who only slept two and a half hours at a time, for a total of four to five hours of sleep per night, had not shown that his sleeping patterns were significantly different from the rest of the population's); <u>see also</u> <u>Heisler</u>, 339 F.3d at 628 (plaintiff failed to establish that her depression significantly restricted her ability to sleep as compared to the general population where the record did not reveal the severity of sleep apnea or whether medication improved her sleep); <u>Pack v. Kmart Corp.</u>, 166 F.3d at 1306 (holding that although plaintiff testified that she often got only two or three hours of sleep a night and there was evidence that plaintiff had episodes of sleep disruption, there was "no indication that her sleep problems were severe, long term, or had a permanent impact").

  Rask has not demonstrated a substantial, long-term limitation on her ability to sleep. Rask's medical records indicate that her inability to sleep was sporadic, rather than a severe and permanent limitation.  Of the medical records in evidence that discuss Plaintiff's ability to sleep, five indicate that she reported difficulty sleeping or insomnia; two mention that she "sometimes"

had difficulty with sleep; two indicate that she was sleeping abnormal hours (one notes her hours of sleep were from 6:00 a.m. to 3:00 p.m., suggesting that she slept for nine hours); four indicate that she was sleeping "better" or "OK;" and two report that she was sleeping for at least eight hours.  Warner Aff. Exs. C-I to C-II; Rask Dep. Exs. 34-36.  Although Rask's husband indicates that he observed Rask having "significant problems . . . sleeping at night," his assertion does not rise to the level of sufficient evidence to show that Plaintiff's ability to sleep was significantly restricted by her depression as compared to the general population.  Robert Rask Aff. at 1.

Finally, Plaintiff asserts that she is substantially limited in the major life activity of working.  To be regarded as substantially limited in the major life activity of working, an individual must demonstrate that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(i); see Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 949 (8th Cir. 1999).  Further, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  29 C.F.R. § 1630.2(j)(3)(i); Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999) ("[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."); Miller v. City of Springfield, 146 F.3d 612, 615 (8th Cir. 1998) (holding that a limitation on a single, particular job cannot constitute a substantial limitation of the major life activity of working under the ADA).

Plaintiff has failed to demonstrate that because of her depression she has suffered a significant reduction in meaningful employment opportunities.  See Webb v. Garelick Mfg. Co., 94 F.3d 484, 488 (8th Cir. 1996).  In August 2005, Plaintiff began employment at a residential care center providing care to individuals with special needs, and is currently working forty hours

21

per week cleaning the facility.  Rask Dep. at 8-9.  Although Plaintiff claims that she was

unemployed for over a year after her termination by Defendant because she could not function,

and was not well enough to look for work consistently, her medical records from this period state

that she had "no depression."  Id. at 89, Exs. 34-36.

Rask testified repeatedly that she disapproved of several of Defendant's management and

operational policies, and stated that the exercise of those policies caused her to be disabled.

Rask Dep. at 80.  She stated repeatedly that she found the work to be stressful, and her medical

records also note the stressful nature of her job.  Despite these assertions, and the possibility that

being a patient care technician for Defendant may not have been the most suitable employment

environment for Rask, Plaintiff has failed to show that she would be precluded from working at a

broad range of jobs in various classes because of her condition.  Plaintiff's impairment does not

substantially limit a major life activity sufficient to constitute a disability within the ADA

definition.

### 2.        Qualified to Perform the Essential Functions

Even assuming Plaintiff is "disabled" within the meaning of the ADA, she must

additionally demonstrate that she is "qualified" under the ADA and is able to "perform the

essential functions of the employment position" with or without reasonable accommodation.  42

U.S.C. § 12111(8).  "An essential function may be established by evidence that includes: (1) the

employer's judgment as to which functions are essential; (2) written job descriptions prepared

before advertising or interviewing applicants for the job; (3) the amount of time spent on the job

performing the function; (4) the consequences of not requiring the incumbent to perform the

function; and (5) the current work experience of incumbents in similar jobs."  Moritz v. Frontier

Airlines, Inc., 147 F.3d 784, 787 (8th Cir. 1998).  An employer's identification of a position's

essential functions is given some deference under the ADA.  Nesser v. Trans World Airlines,

Inc., 160 F.3d 442, 445 (8th Cir. 1998) (citing 42 U.S.C. § 12111(8)) ("[C]onsideration shall be

given to the employer's judgment as to what functions of a job are essential.").

Further,"[t]o be a 'qualified individual' entitled to ADA protection, 'a plaintiff must

show that [her] work performance met the employer's legitimate job expectations,' with or

without reasonable accommodation."  Mole v. Buckhorn Rubber Prods., Inc., 165 F.3d 1212,

1217 (8th Cir. 1999) (citing Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998))

(alteration in original).  The Eighth Circuit  "has repeatedly held that 'regular and reliable

attendance is a necessary element of most jobs.'"  Spangler v. Fed. Home Loan Bank, 278 F.3d

847, 850 (8th Cir. 2002) (citing Pickens v. Soo Line R.R. Co., 264 F.3d 773, 777 (8th Cir. 2001);

Greer v. Emerson Elec. Co., 185 F.3d 917, 921 (8th Cir. 1999); Nesser, 160 F.3d at 445).  "[A]n

employee who is unable to come to work on a regular basis [is] unable to satisfy any of the

functions of the job in question, much less the essential ones."  Spangler, 278 F.3d at 850 (citing

Pickens, 264 F.3d at 777; Moore v. Payless Shoe Source, Inc., 187 F.3d 845, 848 (8th Cir.

1999)) (alteration in original).

Plaintiff's job description states that she is responsible for carrying out all company

policies, as well as for the safe and effective delivery of patient care.  Rask Dep. Ex. 11.

Plaintiff failed to perform these essential functions by her repeated misbehavior.  She was

"verbally abusive to staff" and disrespectful toward her supervisors.  Id. Exs. 21, 23, 26.

Plaintiff's co-workers complained that she was difficult to work with and she frightened one

staff member.  Id. Ex. 23.  On more than one occasion, she complained loudly and acted

inappropriately in the presence of patients.  Id. at 140, Exs. 19, 18, 23.  In addition, Rask

repeatedly failed to assist in patient care.  Id. Exs. 17 at BMA/Rask 0282, 19, 23.  Through the

corrective action process, she was placed on notice that she was not meeting performance

expectations, yet she failed to correct her behavior.  Further, the nature of  Plaintiff's job

required that she be responsive to the medical needs of patients receiving dialysis.  If Plaintiff is

found to be disabled and limited in the major life activities of thinking, concentrating, and

working, she is not qualified to perform the medical procedures that are the essential functions of

her job.

Further, Plaintiff was notified, through the corrective action process, that Defendant

considered attendance to be an essential element of her job.  See Nesser, 160 F.3d at 445

(plaintiff was placed on notice that his employer considered attendance to be an "essential

element" of his job after a series of written attendance warnings).  In her deposition, Rask

acknowledged the importance of attendance, agreeing that absences put a burden on the nursing

staff.  Rask Dep. at 135.  Nonetheless, on the date of her final unscheduled absence, she went to

the doctor on one of only two days during the week that she was scheduled to work.  Despite her

prior warnings, Plaintiff continued to accumulate unscheduled absences and offered no

explanation or doctor's note to notify her employer of her condition or need for time off.

Defendant was unable to accommodate her absences because it had no knowledge of Plaintiff's

depression.  As such, Rask has failed to demonstrate that she was qualified to perform the

essential functions of her position.

### 3.    Legitimate, Nondiscriminatory Reason for Plaintiff's Termination

The burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S.

792, 802-04 (1973), is used to evaluate claims under the ADA.  Burchett v. Target Corp., 340

F.3d 510, 516 (8th Cir. 2003) (citing Wilking, 153 F.3d at 872).  Assuming Plaintiff establishes

her *prima facie* case, the burden then shifts to Defendant to articulate a legitimate,

nondiscriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  Defendant has

presented such a legitimate reason for terminating Rask, specifically that Rask had reached the

final step in its cumulative corrective action policy, and subsequently was absent in violation of

the attendance policy.  Because Defendant has articulated a legitimate, nondiscriminatory reason

for the adverse employment action, the burden shifts back to Plaintiff to demonstrate that the

proffered reason is a pretext for unlawful disability discrimination.  St. Mary's Honor Ctr. v.

Hicks, 509 U.S. 502, 507-08 (1993).  The ultimate burden of proving unlawful discrimination

remains on Plaintiff.  Id. at 507.

As an initial matter, Plaintiff fails to establish the *prima facie* case because there is

insufficient evidence from which to reasonably infer unlawful discrimination under the facts of

this case.  The record reflects Plaintiff was terminated after progressive and cumulative

disciplinary warnings, as well as notice from Pederson and Mitchell that further policy violations

could result in Rask's dismissal.  Despite these warnings, Plaintiff did nothing to make

Defendant aware of her depression or her possible need for time off.  While Plaintiff claims that

she told Pederson and Mitchell of her depression, the evidence in the record suggests that she

only told them that she was "on medication," without giving any indication as to why she was

medicated.  However, even assuming that Plaintiff did tell Pederson and Mitchell of her

depression, she still can not establish the *prima facie* case, or that Defendant's legitimate,

nondiscriminatory reason for her termination was mere pretext.

Although Plaintiff repeatedly relates the sole reason for her termination was her three

unscheduled absences from work, this contention is not supported by the record.  The

termination notice, in addition to listing Plaintiff's unscheduled absences, states that she had not

made the changes required by previous counseling and corrective action and that these events

placed her at the final step in the corrective action process: termination.  Rask Dep. Ex. 29.

Plaintiff has failed to present evidence creating a genuine factual dispute that her termination in

accordance with Defendant's cumulative corrective action policy was a pretext for unlawful

discrimination based on disability.

### 4.      Failure to Accommodate Claims

"Under the ADA, an employer is required to provide reasonable accommodations to the

known physical or mental limitations of an otherwise qualified employee with a disability, unless

the requisite accommodation would impose an undue hardship on the employer's business."

Battle v. United Parcel Serv., Inc., 438 F.3d 856, 862 (8th Cir. 2006) (citing 42 U.S.C. §

12112(b)(5)(A)) (emphasis added).  "Before an employer must make accommodation for the

physical or mental limitation of an employee, the employer must have knowledge that such a

limitation exists.  The Interpretative Guidance on Title I of the ADA states that 'an employer [is

not] expected to accommodate disabilities of which it is unaware.'"  Miller v. Nat'l Cas. Co., 61

F.3d 627, 629 (8th Cir. 1995) (citing 29 C.F.R. app. § 1630.9) (alteration in original).  "In

general, 'it is the responsibility of the individual with a disability to inform the employer that an

accommodation is needed.'"  Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 689 (8th Cir. 1998)

(citing 29 C.F.R. app. § 1630.9).  "Where the disability, resulting limitations, and necessary

reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the

case when mental disabilities are involved, the initial burden rests primarily upon the employee .

. . to specifically identify the disability and resulting limitations, and to suggest the reasonable

accommodations." Wallin, 153 F.3d at 689 (citing Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996)) (alteration in original); see also Russell v. TG Mo. Corp., 340 F.3d 735, 742 (8th Cir. 2003) (holding that it could not be reasonably inferred that the employer failed to accommodate the disability of the plaintiff when the plaintiff only stated that she "was not feeling well" when she needed to leave work and did not reference her bipolar disorder or mental condition at that time).

Plaintiff correctly cites Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011 (8th Cir. 2000), for the proposition that "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith." 214 F.3d at 1021 (citing Fjellestad, 188 F.3d at 952). However, Cravens also states that to establish that an employer failed to participate in an interactive process, one must first show that the employer knew about the employee's disability. 214 F.3d at 1021.

Here, the record overwhelmingly reflects that Rask has failed to notify Defendant of her depression or her need for a reasonable accommodation. She admittedly never submitted any written documentation about her depression, treatment, or medication to her employer until after she was terminated. Although she argues that Pederson and Mitchell knew of her depression, Plaintiff fails to provide any specific accounts of conversations with Pederson, Mitchell, or any other Fresenius employee regarding her depression. Instead, her vague comments about "medication," and "not feeling right," and her absences from work because she was "sick" are not sufficient notice of her depression or need for an accommodation. Rask Dep. at 66, 132, 158; Pederson Dep. at 87-88. Despite the many conversations that Rask had with Pederson and

27

Mitchell about her attendance and performance, Plaintiff did not mention that she was suffering

from depression, nor did she request any type of accommodation.  Her "failure to accommodate

claims" must be denied.

**E.      FMLA**

The FMLA allows eligible employees a total of twelve weeks of leave during any twelve

month period for a variety of reasons, including "a serious health condition that makes the

employee unable to perform the functions of the position of such employee."  29 U.S.C. §

2612(a)(1)(D).  29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to interfere with,

restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.

The regulation interpreting this provision provides, "employers cannot use the taking of FMLA

leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary

actions . . . ."  29 C.F.R. § 825.220(c).  However, "[a] claim under the FMLA cannot succeed

unless the plaintiff can show that he gave his employer adequate and timely notice of his need

for leave . . . ."  Woods v. DaimlerChrysler Corp., 409 F.3d 984, 991 (8th Cir. 2005) (citing

Carter v. Ford Motor Co., 121 F.3d 1146, 1148 (8th Cir. 1997)).  "In order to benefit from the

protections of the statute, an employee must provide his employer with enough information to

show that he may need FMLA leave."  Id. at 990 (citing Thorson v. Gemini, Inc., 205 F.3d 370,

381 (8th Cir. 2000)).  "Although the employee need not name the statute, he must provide

information to suggest that his health condition could be serious."  Id. (citing Collins v. NTN-

Bower Corp., 272 F.3d 1006, 1007-09 (7th Cir. 2001)) (holding that summary judgment for the

employer was proper when an employee with a "spotty attendance record" was discharged after

being absent for two days and calling in "sick," as her call was inadequate notice because it

28

offered no information to suggest that she was suffering from a serious health condition) (internal citation omitted).  "Employees thus have an 'affirmative duty to indicate both the need and the reason for the leave,' and must let employers know when they anticipate returning to their position."  Id. at 990-91 (citing Sanders v. May Dep't Stores Co., 315 F.3d 940, 944 (8th Cir. 2003); 29 C.F.R. § 825.302(c)).

Plaintiff claims that Defendant interfered with her right to leave under the FMLA. Although Plaintiff had access to information about Defendant's FMLA policy through various channels, she admittedly never sought FMLA leave and did not give Defendant any documentation regarding any potential FMLA qualifying absences.  Throughout the corrective action process, Rask was informed that her absences were a policy violation and threatened her performance and her employment.  She had many opportunities to inquire about the FMLA or give her employer enough information to suggest that she may require FMLA leave.  Further, Rask's statement that she did not pursue FMLA leave because her doctor preferred that she stay working suggests that she may have considered FMLA leave, but dismissed it as an option. Rask Dep. at 155.  Rask's vague comments about her medication and calling-in "sick" were insufficient to notify Defendant that Plaintiff potentially had a serious health condition.  As such, Plaintiff has failed to demonstrate that her employer had knowledge or notice of her condition, thus, she cannot show that Defendant interfered with her rights under FMLA.

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant Fresenius Medical Care North America's Motion for Summary

Judgment [Docket No. 35] is **GRANTED**; and

2.      Plaintiff Elizabeth Rask's Application for Judgment by Default [Docket No. 49]

is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 26, 2006.